UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LEON CARLOCK,

        Plaintiff,                            Case No. 19-11969

vs.                                     HON. MARK A. GOLDSMITH

WAYNE STATE UNIVERSITY et al.,

        Defendants.
_____/

## OPINION & ORDER
## DISMISSING THE BREACH OF CONTRACT CLAIM AGAINST WAYNE STATE UNIVERSITY AND OTHERWISE DENYING DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS (Dkt. 12)

Plaintiff Leon Carlock brought this action against Defendants Wayne State University ("WSU") and WSU President M. Roy Wilson, claiming he was dismissed from his tenured position without the process he says he was due. Defendants have filed a motion for judgment on the pleadings (Dkt. 12), contesting that basic argument and further arguing that the Eleventh Amendment bars the breach of contract claim against WSU. With Carlock now agreeing to WSU's dismissal, what remains for decision is whether judgment should be entered in Wilson's favor on Carlock's due process claim. As explained below, the motion is denied.

## I.   BACKGROUND

Carlock became a tenured professor at WSU's School of Medicine ("SOM") in 1995, where he had been a professor since 1987. Resp. at 1 (Dkt. 14). Defendants state that Carlock "has the dubious distinction of undergoing two detenuring processes with WSU." Mot. at 1. The second of these processes ended with Wilson stripping Carlock of tenure and terminating his employment in December 2018. Both processes were, according to Defendants, compliant with

the WSU Board of Governors Code ("BOG Code").  The BOG Code provides context regarding whether Wilson violated Carlock's due process rights by deviating from the BOG Code's mandated procedures.

### A.  The BOG Code

Section 2.51.01 of the BOG Code describes the process by which faculty with tenure may be stripped of tenure and dismissed.[1]  The following sections enumerate the bases for detenuring:

> 2.51.01.040
>
> Tenure may be terminated by the University only for one of the following reasons: (a) adequate cause after opportunity for a fair hearing as provided in section 2.51.01.190 titled Dismissal Proceedings - Faculty with Tenure; (b) failure of the individual to return from a leave within the period specified in the rules and regulations of the University; (c) job abandonment; (d) reaching the age now or hereafter established by this Board as the age for mandatory retirement; (e) the substantial curtailment or discontinuance of a program which removes any reasonable opportunity for using a faculty member's services; (f) extraordinary financial exigencies.  One year's notice of proposed termination will be given except in a termination for cause based on moral turpitude, failure to return from a leave, job abandonment, or upon retirement.
>
> 2.51.01.190    Dismissal Proceedings -- Faculty with Tenure
>
> Faculty with tenure may be dismissed for adequate cause as follows: (a) for acts involving moral turpitude which bear adversely on the ability to perform responsibilities to the University; (b) for serious violation of generally accepted academic standards and principles; (c) for failure to perform academic assignments competently.  (Termination of services at mandatory retirement age, or because of financial exigencies, are dealt with elsewhere.  Job abandonment and failure to return from a leave result in automatic termination, and are dealt with elsewhere. Incompetency arising from physical and/or mental illness or disability is treated under "sick leave" regulations.)

BOG Code §§ 2.51.01.040, 2.51.01.190.

---

[1] The relevant portion of the BOG Code, Appointments, Continuing Tenure, Termination and Dismissal Policies and Procedures for Faculty, BOG Code § 2.51.01, is available at https://bog.wayne.edu/code/2-51-01 (last visited June 24, 2020).

The subsequent sections of the BOG Code describe the investigation and adjudication process.  Id. §§ 2.51.01.200–2.51.01.290.  First, the university president initiates an investigation, either on his or her own initiative or on the recommendation of the administrative head of the respondent's unit (e.g., the SOM Dean).  Id. § 2.51.01.200.  If the president recommends initiating dismissal proceedings after the investigation, "the President shall notify the Respondent in writing of the proposed dismissal and of the reasons therefore [sic] with sufficient particularity to give the Respondent an adequate opportunity to answer the charges and recommendation." Id. § 2.51.01.210.  The respondent may then request a hearing before a seven-member Hearing Committee.   Id. §§ 2.51.01.220–2.51.01.240.   The hearing panel then issues a report to the university president, who may discontinue the matter or recommend dismissal to the Board of Governors.  Id. §§ 2.51.01.250–2.51.01.260.

The Board will then "refer the matter to a Special Committee consisting of members of the Board."  Id. § 2.51.01.270.  That Special Committee may then receive statements or arguments from the respondent and meet with the Hearing Committee.  Id. § 2.51.01.270.  The Special Committee then reports its recommendations to the Board, and the Board can decide whether to order further factfinding, to be conducted either by the Hearing Committee or by a consultant with subsequent review by the Hearing Committee.  Id. § 2.51.01.280.  "Upon concluding its review of the entire matter, the Special Committee shall report to the Board of Governors in executive session for such action as the Board deems justified and appropriate."  Id. § 2.51.01.290.

No provision of this section of the BOG Code authorizes the president to dismiss a tenured faculty member except by following this process.  However, the BOG Code authorizes the president to suspend a faculty member for up to 120 days when "the continued service of a member of the faculty would in the judgment of the President threaten grave and immediate injury to the

University or to its students, faculty, or staff . . . ." Id. § 2.51.01.300. Such emergency suspension is "without prejudice to the final disposition of the matter," does not affect the individual's compensation, and must be reported promptly to the Board of Governors "for such action as the Board may wish to take with reference thereto." Id.

**B. The First Dismissal Proceeding**

In March 2016, SOM Dean Jack Sobel notified Carlock that he was considering recommending detenuring and dismissing Carlock for lack of academic productivity. Hearing Committee Report, Ex. 3 to Answer, at PageID.404 (Dkt. 7-3). On May 31, 2016, Sobel formally recommended to Wilson that Carlock be dismissed; on July 7, 2016, Wilson sent a letter to Carlock accepting Sobel's recommendation and initiating dismissal proceedings. Id. at PageID.406. The letter also notified Carlock of his right to a review of the determination before a hearing committee. Id. Following a request for hearing and briefing, a hearing committee convened in March and April 2018 to hear evidence. The hearing panel consisted of six faculty members—three appointed by the university and three by the SOM—and was chaired by a seventh member, Arbitrator Meeta Bass, a former magistrate on the Jefferson County (Ohio) Court of Pleas. Id. at PageID.407.

The hearing panel considered written evidence and testimony and reached the conclusion that dismissal was justified. Id. at PageID.446. The written decision also discussed due process concerns, acknowledging that under Perry v. Sinderman, 408 U.S. 593, 603 (1972), "a university may be obligated to grant a tenured faculty member a hearing at which the faculty member could challenge the grounds for non-retention." Hearing Committee Report at PageID.433. The committee explained the numerous factors contributing to its belief that the proceedings before the committee fulfilled this requirement, including representation of Carlock by counsel, consideration of testimony and witnesses, consideration of arguments for and against termination, and

compliance with the procedural requirements set forth by the BOG Code.  The committee's recommendation issued on August 30, 2018.  For reasons unexplained, the WSU Board of Governors never voted on whether to accept Wilson's recommendation that Carlock be dismissed. Mot. at 1.

### C.  The Second Detenuring Process

The second detenuring process pertained to an entirely separate issue: whether Carlock had engaged in sexual harassment.  Defendants characterize those allegations as follows:

> On July 2, 2018, during the initial detenuring process, allegations came to light that Plaintiff had used his own funds to hire a former student for 'work' in his lab and engaged in sexually harassing behavior toward the former student.  This behavior included, among other things, smacking her buttock, touching her hair, placing his hands on her hip, asking what age her breasts began to develop, explicitly discussing his sexual relationships and history, frequently attempting to hug the student, and commenting about her body.

Id.

These allegations were investigated, culminating in a report by Nikki Wright, the Director of Equal Opportunity, signed December 6, 2018.  Notice of Disposition, Ex. A to Answer, at PageID.37–52  (Dkt. 7-1).  Concerning the procedural history, the notice of disposition stated the following:

> The OEO conducted an investigation to determine whether alleged violations of University policies occurred.  Complainant signed the Formal Complaint on July 2, 2018.  [Exh. 1].  Respondent submitted his written response to the Formal Complaint on July 30, 2018 [Exh. 2], and was interviewed by OEO on September 13, 2018. [Exh. 3].

Id. at PageID.37.  The investigation concluded that "[s]ubstantial evidence exists to support a finding that [Carlock] violated Title IX, as well as the University Sexual Harassment Statute and Wayne State University Non-Discrimination/Affirmative Action Policy."  Id. at PageID.51.  In the

"Recommendation" section, Ms. Wright wrote, "It is recommended that the matter be referred to the School of Medicine for further proceedings and appropriate action." Id. at PageID.52.

Carlock attempted to appeal Ms. Wright's findings by sending an email to WSU Vice President of Communications and Chief of Staff Michael Wright on December 17, 2018. Carlock Appeal Email, Ex. A to Answer, at PageID.34 (Dkt. 7-1). He claimed that he did not have essential information before he was interviewed by Ms. Wright, that his witnesses had not been adequately interviewed, and that individuals who could attest to his character and behavior were not interviewed. Id. On January 14, 2019, Mr. Wright notified Carlock that this appeal was rejected. Appeal Rejection, Ex. A to Answer, at PageID.35–36 (Dkt. 7-1).

But before Mr. Wright rejected Carlock's appeal, "on December 18, 2018, the School of Medicine recommended removal of Plaintiff and, on December 20, 2018, a letter was sent to Plaintiff removing him from work under the 'moral turpitude' provisions of WSU's Board of Governors Code." Mot. at 3. On December 21, 2018, and again on January 8, 2019, Carlock's attorney sent requests for a termination review hearing. Hearing Requests, Ex. B to Answer, at PageID.357–358 (Dkt. 7-2). Counsel for WSU responded by initiating discussions about empaneling a hearing committee. Amy Lammers Email, Ex. B to Answer, at PageID.332 (Dkt. 7-2).[2]

After some negotiations and discussions between the lawyers, Carlock initiated this suit. Carlock alleged that by detenuring and dismissing him before going through the process outlined

---

[2] A hearing was scheduled to take place some fifteen months later—on May 14, 2020—which, according to Defendants, would have provided "all the process Plaintiff alleges he is due." Reply at 1. This long delay is not explained in the briefing, although Defendants have provided emails showing attempts to schedule the hearing. Emails, Ex. B to Answer (Dkt. 7-2). In any event, the May 2020 hearing was not conducted due to the public health crisis created by COVID-19.

in section 2.51.01 of the BOG Code, Wilson violated Carlock's due process rights in his tenured position and WSU breached a contract implied by the BOG Code.

## II.    STANDARD OF REVIEW

Any party may move for the entry of a judgment after the pleadings are closed, but early enough not to delay trial.  Fed. R. Civ. P. 12(c).  Courts apply the same analysis to motions for a judgment on the pleadings under Rule 12(c) as is applied to applications for dismissal under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.  Warrior Sports, Inc. v. Nat'l Collegiate Athletic Ass'n, 623 F.3d 281, 284 (6th Cir. 2010).  "For purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment."  JPMorgan Chase Bank, N.A. v. Winget, 510 F.3d 577, 581 (6th Cir. 2007) (internal marks omitted).  However, a court need not accept as true legal conclusions or unwarranted factual inferences.  Id. at 581–582.

When evaluating a motion for a judgment on the pleadings, a court considers the complaint, the answer, and any written instrument attached as exhibits.  Fed. R. Civ. P. 12(c).  A court should also consider any undisputed facts.  Stafford v. Jewelers Mut. Ins. Co., 554 F. App'x 360, 369–370 (6th Cir. 2014) (taking judicial notice of undisputed facts in documents considered by district court on ruling on 12(c) motion).

## III.    ANALYSIS

The two-count complaint alleges breach of contract by WSU and denial of procedural due process by Wilson in his individual and official capacities.  Carlock agreed to dismiss the breach

of contract claim against WSU voluntarily.  Resp. at 23.[3]  The remaining analysis considers the due process claims.

Wilson attempts three methods of proving that he is entitled to judgment on the pleadings: (i) due process did not guarantee Carlock any pre-deprivation process; (ii) Carlock received any process he was due through the Title IX investigation; and (iii) he is entitled to immunity.  Each of these arguments will be addressed in turn.

## A.  The Constitutional Right to Due Process

Carlock argues that he was denied due process when Wilson fired him without first holding a hearing.  Cleveland Bd. of Educ. v. Loudermill states some of the basic principles relevant to this issue, particularly emphasizing the need for notice and an opportunity to be heard before termination occurs:

> An essential principle of due process is that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case. . . .  We have described the root requirement of the Due Process Clause as being that an individual be given an opportunity for a hearing before he is deprived of any significant property interest.  This principle requires some kind of a hearing prior to the discharge of an employee who has a constitutionally protected property interest in his employment.
>
> . . .
>
> The need for some form of pretermination hearing, recognized in [precedential] cases, is evident from a balancing of the competing interests at stake.  These are the private interests in retaining employment, the governmental interest in the expeditious removal of unsatisfactory employees and the avoidance of administrative burdens, and the risk of an erroneous termination.  See Mathews v. Eldridge, 424 U.S. 319, 335 (1976).

470 U.S. 532, 542 (1985) (emphasis in original, some internal citations and marks omitted).

---

[3] Defendants argue that Wayne State is an improper party because only the WSU board of governors is capable of suing and being sued.  Mot. at 5 n.2 (citing Mich. Comp. Laws. § 390.641). However, this argument is moot because Carlock agreed to dismiss the breach of contract claim.

In considering claims for procedural due process violations, courts in the Sixth Circuit undertake a two-step analysis.  Leary v. Daeschner, 228 F.3d 729, 741–743 (6th Cir. 2000).  First, it must be determined whether the plaintiffs have a property interest that entitles them to due process.  Id.  Tenured public employment indisputably is the sort of property interest that demands due process, Loudermill, 470 U.S. at 546 (1985); Wilson does not dispute this fact.  Second, courts determine what process is due.  Leary, 228 F.3d at 742.

Wilson alternatively argues (i) that Carlock was not owed any pre-deprivation process, and (ii) that Carlock received whatever process he was owed.  Neither argument is persuasive.

### 1. Wilson is not entitled to a judgment that Carlock was entitled to no pre-deprivation notice and hearing.

Wilson provides three arguments for why he owed Carlock no pre-termination notice and hearing whatsoever: (i) that a promised post-deprivation hearing would provide Carlock with any process he was due; (ii) that Carlock's circumstances fall into a recognized exception to the principle that public employees are entitled to pre-deprivation review; and (iii) that emergent circumstances justified immediate termination.

### a. Elaborate post-termination process does not relieve employers of the obligation to provide notice and some kind of hearing before terminating tenured public employees.

Wilson first argues that "no predeprivation process was required given the elaborate procedure for post-deprivation review in place at WSU."  Mot. at 9.  Wilson's argument fails because it misstates the effectiveness of a post-deprivation process to cure a defect in the pre-deprivation review.[4]  Wilson cites Sutton v. Cleveland Bd. of Educ., 958 F.2d 1339, 1349 (6th Cir.

---

[4] It is also unclear that WSU has any established procedure for post-termination review.  Wilson argues that Carlock will be able to "call witnesses, cross-examine, and present evidence at his final 'post-deprivation' hearing before a faculty committee as part of a faculty-governed process."  Mot. at 9–10.  But assuming Wilson is referring to the process discussed in BOG Code

1992), for the proposition that "[i]f elaborate procedures for post-deprivation review are in place, less elaborate predeprivation process may be required." Mot. at 9. This statement is perfectly true—as far as it goes. The principle comes directly from the Supreme Court's decision in Loudermill, which reached the conclusion that due process did not guarantee the plaintiffs a full adversarial evidentiary hearing prior to termination in part because the Ohio law at issue provided for a full post-termination hearing. See Loudermill, 470 U.S. at 546.

But Loudermill reaffirmed the requirement that prior to termination, a tenured public employee is entitled to "notice and an opportunity to respond." Id. More specifically, the Court stated that "[t]he opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement." Id. (citing Henry Friendly, "Some Kind of Hearing", 123 U. Pa. L. Rev. 1267, 1281 (1975)).

Here, Carlock contends that he was deprived of those basic requirements—notice and an opportunity to be heard. Compl. ¶¶ 18, 19. Sutton is irrelevant to the evaluation of that contention, because in Sutton, the plaintiffs did "not challenge the district court's conclusion that their pre-termination hearings comported with the due process requirements of 'notice and an opportunity to respond.'" Sutton, 958 F.2d at 1349 (quoting Loudermill, 470 U.S. at 546). Instead, they challenged the overall due process they received (pre- and post-termination), on the grounds that

---

sections 2.51.01.040, 2.51.01.190–2.51.01.290, that process does not discuss post-deprivation review. Those hearing provisions repeatedly reference future dismissal, implying that the hearing occurs first. See id. § 2.51.01.040 ("Tenure may be terminated by the University only for one of the following reasons: (a) adequate cause after opportunity for a fair hearing as provided in section 2.51.01.190 titled Dismissal Proceedings - Faculty with Tenure") (emphasis added); id. § 2.51.01.200 ("the basis for the proposed dismissal shall be reviewed . . . .") (emphasis added); id. § 2.51.01.260 ("If the President decides to recommend to the Board of Governors the dismissal of the Respondent . . . ."). Nothing in section 2.51.01 of the BOG Code discusses post-deprivation review or retroactive ratification of a dismissal. Thus, unlike the plaintiffs in Sutton v. Cleveland Bd. of Educ., 958 F.2d 1339, 1349 (6th Cir. 1992), and Loudermill, Carlock has no statutory guarantee of post-deprivation review, "elaborate" or otherwise.

the defendants did not comply with the post-termination provisions of the statutory scheme <u>Loudermill</u> had approved.  Nothing in <u>Sutton</u> or <u>Loudermill</u> suggests that even the most elaborate post-deprivation review process relieves an employer of the obligation to provide notice and some kind of hearing before terminating a tenured public employee.

Wilson also emphasizes a district court opinion that found that a proper post-deprivation hearing nullified the due process errors a city committed before discharging a police officer accused of misconduct.  <u>See</u> <u>Martin v. City of Glasgow, Ky.</u>, 882 F. Supp. 2d. 903, 912 (W.D. Ky. 2012).  According to <u>Martin</u>, "[a]ny procedural misstep that stymies [the procedural due process right] may be cured by conducting a new hearing in compliance with due process requirements." <u>Id.</u> at 912.  <u>Martin</u> is merely persuasive authority, and it relies on Eleventh and Seventh Circuit law for that proposition.  To the extent that <u>Martin</u> or the cases it cites conflict with Sixth Circuit law, their reasoning need not be adopted.

But more likely than <u>Martin</u> being wrongly decided, it simply stated in unnecessarily broad terms what cases like <u>Loudermill</u> and <u>Sutton</u> state in a more measured manner—that courts should consider the availability of robust post-deprivation review when considering what process is owed prior to the deprivation.  Seen in that light, <u>Martin</u> is simply distinguishable on the facts.  In <u>Martin</u>, the plaintiff was given a deficient hearing on March 16, 2011, and was fired immediately.  <u>Id.</u> at 906–907.  On April 14, 2011, the defendants realized their mistake and attempted to undo the error by rescinding the termination, placing the plaintiff on suspension retroactive to March 16, and scheduling a hearing for May 3, 2011.[5] <u>Id.</u> at 907.

---

[5] In light of the fact that the plaintiff in <u>Martin</u> had been reinstated prior to May 3 hearing date, it is also unclear whether the May 3 hearing was properly characterized as a post-termination hearing.

Here, by contrast, Wilson has not acknowledged an error, has not reversed Carlock's termination, and has left Carlock waiting for a hearing for eighteen months. Martin does not purport to hold that the mere promise of a hearing, many months after a termination without process, cures all prior error. Wilson's attempt to deploy Martin in that manner is rejected.

### b. Carlock's circumstances do not fit into the "specific benefit, term, or condition of employment" exception.

As Defendants note, the Sixth Circuit recognizes one circumstance in which no pre-deprivation hearing is required. See Leary, 228 F.3d at 743. "State postdeprivation procedures are sufficient, and neither a predeprivation hearing nor a federal cause of action is necessary, when the property interest at stake is a 'specific benefit, term, or condition of employment,' the loss of which is easily quantified, rather than the 'tenured nature of the employment itself.'" Id. (quoting Ramsey v. Bd. of Educ., 844 F.2d 1268, 1274 (6th Cir. 1988)). For example, in Ramsey, the Sixth Circuit found that a public employee's right to compensation for a number of unused accumulated sick-leave days was adequately protected by his ability to sue in breach of contract, so the employee's due process rights were not violated by the lack of pre-deprivation review. See Leary, 228 F.3d at 743.

Leary states that loss of tenure falls outside of this exception, because it is "more analogous to the complete termination from a post in Loudermill than the loss of a specific and primarily economic benefit in Ramsey." Id. Here, Carlock has both been stripped of tenure, as in Leary, and completely terminated, as in Loudermill. Either one of those would be sufficient to remove his case from the exception recognized in Ramsey. Leary and Ramsey do not demonstrate that Wilson is entitled as a matter of law to a judgment that he owed Carlock no pre-deprivation review.

### c. Wilson has not proved that emergent circumstances justified his actions.

Wilson also argues that he did not owe Carlock any pre-deprivation process, because he had "a legal duty under Title VII and Title IX to remove Plaintiff from the workforce in order to take prompt remedial measures to eliminate sexually harassing behavior." Mot. at 10. He says that this included Carlock's "termination without compensation where [Carlock] used his university salary to privately employ a student to sexually harass her." Id. Wilson cites no law to support this assertion.[6] Instead, he relies generally on the due process principle that courts must balance the parties' interests and the risk of erroneous deprivation when determining what process is due. See Mathews v. Eldridge, 424 U.S. 319, 335 (1976).

Wilson undoubtedly had a strong interest in protecting the university community from a professor who, according to the Title IX investigation, used his post to sexually harass a student. But the entire equilibrium struck by Loudermill—that only minimal pre-termination process is owed when an elaborate post-deprivation process exists—is premised on the government's "interest in quickly removing an unsatisfactory employee." Loudermill, 470 U.S. at 546. So Wilson's claim that he had to move quickly to remove an unacceptable employee is precisely the circumstance that Loudermill anticipated—not some newfound exigency that excuses a failure to accord due process. And sadly, this is far from the first time a university administrator has had to account for Title IX and the obligation to ensure a university environment free of sexual

---

[6] In a footnote in the reply, Wilson cites cases collectively establishing an obligation to take all steps necessary, or perhaps all reasonable steps, to prevent and respond to sexual harassment. Reply at 4 n.1 (citing, inter alia, Vance v. Spencer Cty. Pub. Sch. Dist., 231 F.3d 253, 260 (6th Cir. 2000)). But these cases do not support Wilson's assertion that Title IX demanded the specific course of action he took—immediate termination without process or compensation. No one seriously doubts that Wilson had an obligation to respond swiftly and decisively; Carlock's claim is that Wilson could not ignore the constitutional guarantee of due process while doing so.

13

harassment and violence when determining what process to give a student or faculty member accused of sexual misconduct.  See, e.g., Smock v. Bd. of Regents of Univ. of Michigan, 353 F. Supp. 3d 651, 657 (E.D. Mich. 2018); Doe v. Baum, 903 F.3d 575 (6th Cir. 2018).  Nothing in those cases suggests that Wilson could ignore longstanding principles of due process because Carlock was accused of sexual harassment.

Furthermore, Wilson had choices other than leaving Carlock in his post and terminating him immediately.  In particular, as discussed above, the BOG Code granted Wilson the power to suspend Wilson up to 120 days while he initiated a proper dismissal proceeding.  BOG Code § 2.51.01.300.  It is true that due process does not require that Wilson follow exactly the course of action contemplated by the BOG Code.  See Cox v. Shelby State Cmty. Coll., 48 F. App'x 500, 508 (6th Cir. 2002) (dismissing a portion of a complaint because it was "based on the state's deviations from its own procedures, rather than a denial of the minimal process that is constitutionally required").  But the fact that the BOG Code provided Wilson with a measured and expedient route for removing the danger Carlock supposedly posed belies Wilson's claim that his only reasonable option was to fire Carlock immediately.  Thus, Wilson has failed to show that he is entitled to a judgment that the circumstances warranted firing Carlock immediately.

Carlock's allegation that he was denied notice and opportunity to be heard is pleaded adequately and is well supported by law.  The evidence Defendants provided in their answer and the arguments presented in their briefing only underscore the plausibility of Carlock's claim.

## 2. Wilson has not shown that he is entitled to a judgment that the Title IX investigation provided Carlock with adequate pre-termination review.

Wilson argues in the alternative that he provided Carlock any pre-deprivation process he was due through the Title IX investigation.  He claims that providing Carlock with the graduate student's Title IX complaints satisfied the notice requirement, and that Wilson's written response

14

to the allegations and his participation in the interview with Ms. Wright satisfied Carlock's right to be heard.  Carlock does not dispute having received the Title IX complaint, and he participated in the interview.  But he argues that these facts do not negate his allegation that Wilson failed to provide notice and an opportunity to be heard on the question of whether he should have been terminated.  He is correct.  Carlock has identified at least three requirements of pre-termination review that Wilson has failed to prove were satisfied by the Title IX investigation: (i) notice of proposed action, (ii) opportunity to be heard on the question of whether the proposed action should be taken, and (iii) an opportunity to be heard before a decisionmaker.[7]  Any of these alone would be sufficient to defeat Wilson's motion.

### a. Wilson has not offered proof that he notified Carlock that he was considering terminating him based on the allegations of sexual harassment.

"Procedural due process requires that the government, prior to depriving an individual of their property, provide that individual with notice of the proposed action and an opportunity to be heard."  Paterek v. Vill. of Armada, Michigan, 801 F.3d 630, 649 (6th Cir. 2015) (emphasis added).  But Wilson has provided no evidence that he notified Carlock that he was considering terminating him based on the graduate student's allegations.  See Notice of Disposition; Formal Complaint, Ex. A to Answer, at PageID.54–58 (Dkt. 7-1).

---

[7] Carlock also argues that he had a clearly established right to cross-examine the graduate student. In Doe v. Baum, 903 F.3d at 578, the Sixth Circuit reiterated its holding that "if a public university has to choose between competing narratives to resolve a case, the university must give the accused student or his agent an opportunity to cross-examine the accuser and adverse witnesses in the presence of a neutral fact-finder."  Recent district court cases have applied this principle to a professor accused of misconduct.  See Smock, 353 F. Supp. 3d at 657; Frost v. Univ. of Louisville, 392 F. Supp. 3d 793, 805 (W.D. Ky. 2019).  However, the moment at which this right attaches—during the investigation, during pre-deprivation review, or during post-deprivation review—is not entirely clear from the cases presented.  There is no need to address this issue definitively to conclude that Wilson is not entitled to judgment on the pleadings on the question of whether he deprived Carlock of his opportunity for notice and hearing.

Wilson argues that Carlock was on notice because he was "aware of the BOG Code, which includes its sexual harassment policies and provisions for immediate termination due to moral turpitude." Mot. at 11–12. In other words, Wilson maintains that he fulfilled the notice requirement because Carlock should have drawn the inference from available facts that he was facing immediate termination, and that the interview with Ms. Wright would be his one and only pre-termination opportunity to present arguments why he should not be fired.

The first problem with this argument is that the BOG Code contains no provision authorizing immediate termination. The BOG Code contains an exception to the one-year notice requirement when termination is based on moral turpitude. BOG Code § 2.51.01.040. But it does not contain an exception to the requirement of a fair hearing as described in sections 2.51.01.190–2.51.01.290. Dismissal "for acts involving moral turpitude" is a form of "adequate cause" termination, id. § 2.51.01.190, and adequate cause termination occurs "after opportunity for a fair hearing," id. § 2.51.01.040. An individual familiar with the BOG Code—as Carlock likely was, having gone through nearly all the steps of the detenuring process once before—would be even less likely than other individuals to expect that termination could occur immediately after the Title IX investigation. Immediate termination was not foreseeable, much less noticed.

The second problem with Wilson's argument is that allowing notice of an investigation of a terminable offense to constitute notice that the employee was immediately facing termination would eviscerate the requirement that employers provide notice of their proposed action. Public employers could hide their true intentions behind a notice of investigation and catch employees flat-footed by telling the employees, after the fact, that the investigation was also their opportunity to be heard. Due process demands more, and Wilson has presented no caselaw suggesting that Paterek's requirement of providing notice of the proposed action can be circumvented so easily.

Wilson's response to this line of reasoning is unpersuasive.  In the reply brief, Wilson responds to Carlock's contention that he was not given notice that he might be terminated under the Code's "moral turpitude" provision by mischaracterizing Carlock's argument:  "Plaintiff seeks to sidestep these facts by claiming that while he had notice of sexual harassment, he did not know that harassment could constitute 'moral turpitude.'"  Reply at 6.  Defendants then cite a case in which sexual harassment was held to constitute moral turpitude in the academic context.  Id. (citing Tonkovich v. Kansas Bd. of Regents, 159 F.3d 504 (10th Cir. 1998)).  But Carlock's argument is not that he could not have foreseen a moral turpitude charge coming down the pike based on the allegations of sexual harassment, but that Defendants did not notify him that they were considering terminating him immediately on that basis.  Tonkovich is, therefore, irrelevant.[8]

Carlock had a right to be notified of the potential adverse action.  Wilson has not proved that Carlock's allegation that he did not receive such a notice is implausible, and Wilson is, therefore, not entitled to a judgment on that point.

> **b.  Wilson has not proved that the Title IX investigation provided Carlock an opportunity to be heard on the question of whether he should be terminated for moral turpitude.**

As stated previously, "[t]he opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement."  Loudermill, 470 U.S. at 546 (emphasis added).  The Title IX investigation did not provide Carlock an opportunity to be heard on the question of whether he should be detenured and terminated, both because Carlock lacked notice and because the Title IX investigation did not focus on that question.

---

[8] Professor Tonkovich himself was not dismissed until after (i) he received a formal complaint, which included charges of moral turpitude and a warning that termination was a possible outcome; (ii) he received an extensive evidentiary hearing before a hearing committee; and (iii) the university chancellor accepted the committee's recommendation.  See Tonkovich, 159 F.3d at 504–515.

Carlock may have been afforded an opportunity to be heard on the question of whether he violated Title IX, but his ability to rebut the graduate student's claim is not the same as the opportunity to argue that he should not be fired for moral turpitude.

The Title IX investigation was never presented to Carlock, or conducted, as an effort to determine whether he should be fired for moral turpitude. The notice of disposition of the Title IX investigation says nothing about detenuring or termination, and it specifically recommends that the SOM take the next step. See Notice of Disposition at PageID.52. Furthermore, during the course of the interview, Ms. Wright repeatedly emphasized that she was only investigating the graduate student's sexual harassment allegations and was not interested in other subjects, including at least one, Wilson's character, that would be relevant to evaluating his moral turpitude.

- When introducing the subject matter of the of the interview, Ms. Wright said, "Okay, so today I will be asking you questions regarding her allegations and you can provide additional responses to her allegations other than what were in writing, but I will ask you details about the allegations as well as your response, and as I stated, this is a sexual harassment complaint." Title IX Interview, Ex. 1 to Answer, at PageID.75 (Dkt. 7-1).

- When Carlock encouraged Ms. Wright to investigate facts that may have been probative of the graduate student's credibility, she refused and said, "I'm interested in her sexual harassment allegations with you, not how she interacted with other people." Id. at PageID.245.

- When challenged again, she said, "I am the investigator and my job as an investigator is to investigate sexual harassment claims." Id. at PageID.246.

- When Carlock suggested that Ms. Wright interview character witnesses who could attest to his character, she refused. She asked, "When you say 'character,' you mean whether this person is a good person or not a good person?" When he clarified that he referred to women who could attest to the fact that he did not harass them, she said that she was "not interested in speaking with those people." Id. at PageID.247.

From these statements, Ms. Wright appears to have been interested in investigating whether Carlock sexually harassed the graduate student. She was not interested in investigating Carlock's character, as someone evaluating moral turpitude might be. The subject of whether he should be

detenured and terminated did not come up throughout the discussion.  Although Ms. Wright afforded Carlock limited opportunities to ask her questions, she controlled the flow of the meeting in a manner more characteristic of an investigator than an adjudicator.  He may have had the opportunity to present his side of the story with respect to whether he sexually harassed the graduate student, but not whether he should be fired for moral turpitude.  Thus, the Title IX interview and the notice of disposition do not prove the implausibility of Carlock's allegation that he did not receive an opportunity to be heard on the question of whether he should be dismissed for moral turpitude.

Defendants also argue that the Title IX investigation satisfied Carlock's right to be heard because he was able to file an appeal.  Mot. at 11.  While appellate rights are one indicator of procedural fairness, they are not a substitute for notice and an opportunity to be heard, the bedrock pre-termination requirements according to Loudermill.  Furthermore, the termination occurred before Mr. Wright responded to Carlock's appeal, suggesting that the appeal was not a check on the termination.  Appeal Rejection at PageID.35–36.  Finally, Carlock's email did not mention or purport to appeal termination—perhaps a natural consequence of the fact that, as far as the record shows, termination had not yet been discussed as of the day Carlock sent his email.  Therefore, the fact that Carlock could appeal the Title IX determination is of no moment when considering his allegation that he did not receive a hearing before being terminated.

### c.  Wilson has not proved that the Title IX investigation satisfied Carlock's right to be heard by a decisionmaker.

Wilson's theory that the Title IX investigation proves that Carlock received an opportunity to be heard suffers from an additional deficiency. Wilson has failed to prove that Ms. Wright was a decisionmaker who had discretion whether or not to dismiss Carlock.  Wilson erroneously argues that Carlock had no right to be heard by a decisionmaker.

On this subject, the parties debate <u>Duchesne v. Williams</u>, 849 F.2d 1004 (6th Cir. 1988) (en banc).  In <u>Duchesne</u>, the issue was whether <u>Loudermill</u> requires "that a discharged municipal employee receive a pretermination hearing before a neutral and impartial decisionmaker rather than before the supervisor who fired him."  <u>Id.</u> at 1004.  In holding that <u>Loudermill</u> did not have such a requirement, the <u>Duchesne</u> panel stated that "a right of reply before the <u>official responsible for the discharge</u> is the entitlement contemplated in <u>Loudermill</u>."  <u>Id.</u> at 1005 (emphasis added).  Carlock seizes on this statement and similar language elsewhere in <u>Duchesne</u>, <u>see id.</u> at 1006–1007, to argue that the Title IX interview could not be a proper <u>Loudermill</u> hearing because Ms. Wright was not a decisionmaker with the authority to determine whether Carlock should have been dismissed.  Carlock does not argue that he had a right under <u>Duchesne</u> and <u>Loudermill</u> to appear before someone neutral and impartial.  Rather, he argues that he had the right to appear before a decisionmaker—the individual or committee responsible for the discharge.

Wilson claims that <u>Duchesne</u> rejected Carlock's argument when it noted "that the word 'decisionmaker' is synonymous with 'employer' in this context."  Reply at 6.  But <u>Duchesne</u> does not state that.  <u>Duchesne</u> states, "Note that the [<u>Loudermill</u>] Court uses the word 'decisionmaker,' which means the official responsible for the discharge."  <u>Duchesne</u>, 849 F.2d at 1007.  Of course, the official responsible for the discharge will generally work for the same agency as the individual being discharged.  In this sense, a hearing before the decisionmaker is a hearing before the employer.  But this does not mean that when <u>Duchesne</u> held that a <u>Loudermill</u> hearing could occur before an "employer," it meant that the hearing could occur before <u>any</u> agent of the employer, whether or not the termination was within the scope of that individual's authority.

Wilson thus either misunderstands Carlock's argument or <u>Duchesne</u>.  <u>Duchesne</u> by no means rejects the argument that a <u>Loudermill</u> hearing must occur before a decisionmaker; it says

four times that a <u>Loudermill</u> hearing must occur before the "official responsible for the discharge." <u>Duchesne</u>, 849 F.2d at 1005–1007.  It seems unlikely that each one of WSU's thousands of employees would meet this definition.  Furthermore, <u>Duchesne</u> quotes language from <u>Loudermill</u> stating, "Even where the facts are clear, the appropriateness or necessity of the discharge may not be; in such cases, the only meaningful opportunity <u>to invoke the discretion of the decisionmaker</u> is likely to be before the termination takes effect."  <u>Duchesne</u>, 849 F.2d at 1007 (quoting, and adding emphasis to, <u>Loudermill</u>, 470 U.S. at 543)).  <u>Duchesne</u> only gives force to this statement if it requires <u>Loudermill</u> hearings to occur before individuals or committees authorized to exercise discretion.

Thus, Carlock's allegation that his "hearing" was deficient because it did not occur before a decisionmaker has an adequate basis in law.  And it has an adequate basis in fact, because the BOG Code does not appear to endow Ms. Wright with the discretion whether or not to terminate Carlock, and she does not write like someone with that authority when she concludes her notice of disposition by writing, "It is recommended that the matter be referred to the School of Medicine for further proceedings and appropriate action."  Notice of Disposition at PageID.52.  Whether Ms. Wright actually had that authority is a question for a later day.  But at the pleading stage, the fact that Carlock's supposed "hearing" occurred before an individual who may not have been a decisionmaker is a plausible basis for Carlock's claim that he was denied due process.

Wilson is not entitled to judgment as a matter of law that Carlock received due process based on this interview with Ms. Wright.

### B.  Wilson's Claims of Immunity

Even where a plaintiff can prove a due process violation, defendants may also be protected by various forms of immunity.  As a state official, Wilson is entitled to total immunity when being

sued in his official capacity, except that he may be sued for injunctive relief for alleged constitutional violation under the Ex parte Young doctrine.  Here, Carlock has asked for injunctive relief, including a reversal of the termination.  See Compl. at 9.  In a suit involving similar circumstances, the Sixth Circuit held that a discharged professor alleging a constitutional violation may sue for "the equitable and prospective remedy of reinstatement" under Ex parte Young.  Cox, 48 F. App'x at 504.  The official capacity claims for injunctive relief are not barred by the Eleventh Amendment or other sources of sovereign immunity.

Qualified immunity shields government officials sued in their individual capacities from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional law of which a reasonable person would have known.  Adams v. Blount Cty., Tenn., 946 F.3d 940, 947 (6th Cir. 2020).  In determining whether Wilson is shielded from civil liability due to qualified immunity, the Court must determine whether those rights were clearly established at the time of the alleged violation.  Id. at 948.

Here, the right to notice and opportunity to be heard prior to a termination decision was clearly established no later than the issuance of Loudermill in 1985.  Loudermill itself is clear that an opportunity to be heard includes a right to explain why a proposed action should not be taken; Paterek, issued in 2015, clearly establishes that notice must include a description of proposed adverse action; and Duchesne, issued in 1988, clearly establishes that a Loudermill hearing must occur before a decisionmaker.  Furthermore, the fact that the BOG Code required Defendants to provide Carlock with a hearing put Wilson on notice that his alleged actions were unlawful.  See Silberstein v. City of Dayton, 440 F.3d 306, 316–318 (6th Cir. 2006) (considering the language of a municipal charter in determining that no reasonable official would believe that discharging the employee without process would be lawful).

Wilson is not entitled to a judgment on the pleadings based on his assertion of qualified immunity.

## IV.   CONCLUSION

Carlock's breach of contract claim against WSU is dismissed without prejudice. Defendants' motion for judgment on the pleadings (Dkt. 12) is denied in all other respects.

SO ORDERED.

Dated:  June 25, 2020                                   s/Mark A. Goldsmith
     Detroit, Michigan                              MARK A. GOLDSMITH
                                                     United States District Judge